524-0147. And here on behalf of the felon is Mr. Mark Field. Okay, Mr. Mark Field, why don't you come up and tell us what you're thinking today. Are you from OSED 1? I am, Your Honor. Okay, well, welcome to the 5th District. Well, thank you. I've been here before, but thank you. May it please the Court and counsel, I'm Robert Mark Field and I represent Tyler Lewis. I have no doubt that this case was a difficult one for defense counsel to try, given the horrific nature of the crime and the number of witnesses called by the state, expert medical and lay. The counsel made two remarkable, mutually reinforcing and prejudicial blunders that cannot fairly be situated within the wide scope of trial strategy, even for a case this complex and therefore constituted ineffective assistance of counsel. First, counsel presented the jury with over three hours of nearly unredacted video of pre-trial interviews with two of the state's main witnesses, namely the injured infant's own mother, Chelsea, and her best friend, Whitney, who supported assistance. Chelsea enlisted shortly after discovering the injuries to her child on the morning of January 11, 2018. Second, defense counsel submitted a version of IPI Instruction 3.11 with a highly consequential typographical error instructing the jury that it could give unlimited consideration to prior consistent statements rather than prior inconsistent statements, even though, of course, consistent statements are prohibited. This latter error, like the former, ultimately related to the three hours of video, and therefore, the two blunders should be considered in conjunction in assessing both deficient performance and consequent prejudice. Yes, Your Honor. The three hours of video evidence was most especially prejudicial in that Chelsea and Whitney were depicted reporting to a police detective that the defendant essentially admitted or agreed that he had sexually molested the child. Indeed, in their respective interviews, both Chelsea and Whitney provided similar accounts of that admission. Both Chelsea and Whitney told the detective that they told Tyler that the baby had been raped or asked the defendant whether he used his fingers or penis, and the defendant responded according to one of them, quote, it only happened once, unquote, or according to the other, I only did it once, unquote. By contrast, in their actual testimony, Chelsea did not admit, did not indicate that the defendant made any specific admission, though she did indicate that the defendant acted strangely or suspiciously, and Whitney testified that the defendant admitted to biting and shaking the child, but not to any sexual assault. So a big contrast there. Playing these videos to impeach Chelsea and Whitney was not reasonable trial strategy. Any conceivable benefit that the defendant would derive from the diminution in the witness's credibility due to the discrepancies between Whitney and Chelsea's testimony and their respective video interviews would have been just vastly outweighed by the prejudice of admissions to sexual assault of a child. This is especially so in that the jury would have understood that five and a half years elapsed between the incident and the trial testimony, but only a few days elapsed between the incident and the police interviews of these witnesses, giving the latter a certain credibility that even the testimony lacked. Furthermore, it may be overgenerous to attribute any strategic rationale whatsoever to the failure of defense counsel to redact the videos or to impeach these witnesses with edited transcripts, which the court urged defense counsel to do and, indeed, which the prosecutor urged defense counsel to do in the interest of assuring a fair trial. Defense counsel's main explanation for failing to redact the videos or use edited transcripts to impeach was, in his own words, extraordinarily, quote, technical incompetence, unquote. The prior consistencies as between Chelsea and Whitney's trial testimony and their videotaped statements to police were likewise highly prejudicial. As the law recognizes, a witness's prior consistent statements for the purpose of corroborating her testimony are prohibited because people tend to believe that which is repeated most often, regardless of intrinsic merit, and repetition can therefore lend unmerited credibility to testimony. Here, the jury heard Chelsea and Whitney, respectively, give their emotionally charged accounts twice, first in the form of their lengthy testimony and then, needlessly and at the behest of trial counsel, in more than three hours of police interviews. The jury was thus able to hear repeated accounts of the defendant's callously uninterested behavior when the injuries to the child were discovered, the mysterious disappearance of a bag of evidence collected by Chelsea that later turned up in a nearby library dumpster, and Chelsea and Whitney's perception that admissions made later that day by the defendant to Chelsea's friends and cousins at Pentonville were not the product of coercion, even though Chelsea acknowledged that the defendant had been struck there by two of her friends. Especially prejudicial was Whitney's alleged observation of a thumbprint on the infant's neck and Chelsea's observation that the bruises on the infant got worse in the hours after she discovered the infant's injuries. The formula of these observations explains the infant's lack of outcry when her mother was sleeping downstairs, and both observations suggest the recency of the assault, two matters that were much in dispute. Again, the jury heard of these observations twice, both in the form of Chelsea and Whitney's trial testimony and then in the form of their videotape statements to the detective. It is true that few appellate court cases have found improper admission of prior consistent statements constitutes prejudicial error, but this case has the unique feature of an incorrect jury instruction informing the jury that it could give consistent statements unrelated consideration. To emphasize, that is three hours of mostly consistent videotaped statements, much of it highly emotional, as the case would certainly justify from two key witnesses, more than days after the incident, and an erroneous jury instruction that informed the jury that it could give unlimited consideration to these prior consistent statements. As to the existence of prejudice in light of all the evidence, I do not want to be evasive. Even though we contend that for the deficiencies of counsel's performance, there's a reasonable likelihood that the result of trial would have been different. There was some evidence against the defendant, especially in the form of his partial Miranda's confession and other circumstantial evidence related to the defendant's presence in Chelsea's house as her living boyfriend. However, I don't think that was sufficient to justify the conviction in light of these errors. As to the partial confession, the defendant did admit to biting the child eventually. He initially denied it, but persistently denied inflicting the other injuries, the burning, penetration, and the injury to the infant's tongue. This partial confession does not establish lack of prejudice in light of the defendant's youth, his distress and possible mental confusion that resulted from being beaten up by Chelsea's friends the day before, and the detective's use of a psychologically manipulative interview technique called the Lee technique, in which the interviewer at some point assumes the defendant's guilt and gives the suspect rationales for his behavior. As to the circumstantial evidence, there was a plausible alternate suspect, namely Chelsea's drug dealer, Devin, who visited her home in the late night and early morning hours before the injuries to the child were discovered. A competent defense is every bit as imperative morally and constitutionally when the crime charged was especially detestable. The defense counsel's remarkable and mutually reinforcing blunders of presenting the nearly unredacted videos to the dismay of both the court and the prosecutor and submitting incorrect jury instructions and prior statements deprive the defendant of his right to effective assistance of counsel. Thank you, Your Honors. Thank you. Do you have questions, Justice Hackett? No, thank you. Yes, ma'am. Okay. Ms. Osment O'Brien, you may use your computer at the lectern if you need it. Well, unfortunately, I don't have Wi-Fi, and I have the wrong version saved, but luckily I printed it out because I knew that that was a possibility, so it's all good. Okay. Good afternoon, Your Honors, counsel, may it please the court. My name is Valerie Osment O'Brien, and I represent the state in this matter, the people of the state of Illinois versus Tyler Lewis. The defendant argues that his trial counsel was ineffective in two ways. First, by presenting the nearly complete videotaped interviews of Chelsea Hawkins and Whitney Scott, state witnesses, and second, by tendering a jury instruction, IPI 3.11, with the word inconsistent mistakenly replaced by consistent. The state's position in this case is very straightforward. Under Strickland, counsel strongly presumed to have acted within the wide range of reasonable professional assistance, and the record here shows both a rational trial strategy and, more importantly, no prejudice. So I will address three points today. First, counsel's actions were strategy, not deficiency. Second, there was no reasonable probability of a different outcome, given the overwhelmingly independent evidence of guilt. And third, even if errors did occur, they were harmless beyond a reasonable doubt. First, the defendant claims to have received ineffective assistance from his trial counsel due to counsel presenting at trial, as impeachment evidence, police investigatory interviews with the state's witnesses, Chelsea and Whitney, in which the defendant contends Chelsea and Whitney provided very prejudicial statements that they did not testify to at trial, specifically that the defendant made damaging admissions to the charged offenses that had not otherwise been introduced into evidence, acted in a highly suspicious manner, and was a deranged person. But to prevail under Strickland, the defendant must demonstrate that counsel's performance was objectively unreasonable, and he can't do that in this case. There's a strong presumption, first and foremost, that counsel's action was a matter of trial strategy, and matters of trial strategy will not support a claim of ineffective assistance unless the strategy failed to, was entirely so unsound that he failed to conduct any meaningful testing of the state's case. That's not what happened here. Moreover, ineffective assistance claims cannot be based merely on conjection or speculation. Strickland requires actual prejudice. At trial, defense counsel sought to impeach Chelsea and Whitney's trial testimonies with the videotape interviews they gave at the Harrisburg Police Department with Detective or Sergeant Hustedy. During cross, specifically, defense counsel asked Chelsea and Whitney several questions regarding what they had told defense, or what they had told Hustedy in their interviews, which was over five and a half years earlier. Attempting to show inconsistencies between their accounts of events in their interviews versus what they had testified to at trial, which Chelsea and Whitney either denied or testified that they just could not remember, because, again, it was over five and a half years before that. So, therefore, defense counsel asked the trial court if he could play the interviews for purposes of impeachment, arguing that a significant benefit of doing so would be to show that Chelsea never mentioned or was asked about Devin during either of her interviews, and the defendant's strategy included an attempt to show the jury that it was actually Devin who caused T.G.'s injuries and not the defendant, and that Hustedy's investigation was flawed because the defendant argues that Hustedy made up his mind long before the case went to trial, but the defendant was responsible for T.G.'s injuries. Defense counsel indicated the interviews were too long and rich in detail to conduct an effective cross-examination without playing them in their almost entirety and that the jury needed to hear the inconsistencies between Chelsea and Whitney's earlier accounts and their trial testimonies. Defense counsel stated that he wanted the entirety of the interviews shown to the jury in order to demonstrate specifically that there was no mention of Devin. So, accordingly, the jury heard about three hours and 15 minutes of the interviews, and counsel was able to start and stop the video when certain prejudicial statements were made, so the jury didn't hear everything, as the defense would like for you to believe. What defense counsel did here is the literal definition of reasonable trial strategy. It was the defense's strategy to play the interviews for the jury in order to emphasize inconsistencies between Chelsea and Whitney's earlier accounts and their trial testimonies. As the defense counsel noted at trial, counsel aimed to show that Chelsea and Whitney made multiple conflicting and inconsistent statements regarding when and how the defendant admitted guilt to them and the extent of his involvement. Therefore, if playing the entirety of the interviews ensured that the jury could properly evaluate the witness's tones, demeanor, and context. The Illinois Supreme Court has made very clear that trials cannot be conducted error-free and that perfection in trial procedure is virtually unattainable. The defendant is entitled to a fair trial, not a perfect one. Accordingly, the decision by trial counsel to have the almost entire videotaped interviews played for the jury was a matter of trial strategy, and it will not support a claim of ineffective assistance. Didn't counsel, though, make a statement that he knew parts of it were prejudicial? Yes, but he wanted to specifically ask the judge, I want to show these videos so that the jury can see them and see these inconsistencies between what Chelsea and Whitney are now claiming at trial and what they said five and a half years ago. He wanted to point that out for the jury so that the jury could make a decision on their own volition of what exactly happened and who was actually credible. But even within his trial strategy, he's admitting to the court that there's prejudice. Well, of course there's going to be prejudicial statements in anything that someone says about your client when they're on trial for such a heinous crime. Inherently, it's going to be prejudicial. But whether or not it's ineffective assistance of counsel is a whole different situation. And in this case, it was not. It simply just wasn't. It was the literal definition of it. He wanted to use these interviews and made it very clear to the court why. Because they were trying to show that it was actually Devin, not the defendant, who did it. However, Devin was excluded as a suspect early on by the Weiser analysis. Expert witness testimony, Corey, testified that Devin was excluded as a suspect by the buccal swabs taken from him two years into the investigation. However, the defendant could not be excluded by DNA evidence. Actually, it was three times more likely either the defendant or a male relative of the defendant who inflicted these bite wounds on this child. These child wounds were not self-inflicted by any means necessary. She was nine months old at the time. How much weight or consideration should we give to the fact that the trial attorney said, as far as editing or stopping the video, that it wasn't something to the effect of technologically capable? The work was overwhelming? So, Your Honor, yes. If this court decides that there were errors, it still doesn't matter because the defendant is unable to prove prejudice in this case. So, assuming, for arguendo's sake, that this court does decide that it was unreasonable trial strategy, there is no probability that but for these videos not being played, that the results of the proceeding would have been different based on the amount of overwhelming evidence that was presented at trial. The state's brief lays it out in very good detail. I will summarize it for you now. First and most importantly is the defendant's own admissions. On video with Sgt. Hastetti, the defendant admitted to biting T.J. six times while being upstairs and alone with her in the Logan Street house, out of frustration, saying, I admit to biting her, 100%, quote. Hastetti testified that before the interview began, he'd already spoken with Chelsea and Mark, both of whom indicated to him that the defendant had admitted to biting T.J. Hastetti indicated that because the defendant admitted to biting T.J. to him as well as to others, this, in Hastetti's mind, lent credibility to these admissions that the defendant made. Additionally, both Whitney and Brandon testified that the defendant admitted to them at separate times that he bit and shook T.J. And Hastetti testified that during an interview with Chelsea, Chelsea told Hastetti that the defendant had brought T.J. to her and admitted that he had bit and raped her. Further, Dalton Conkle testified that the defendant admitted to him that he bit and burned T.J. and that he used a Q-tip in her vagina. And Chelsea testified that the defendant told Mark that he hurt T.J. because he was mad at Chelsea. Someone hurt this baby, and the only possible person that could have seen what happened to her was the defendant based on the time of when she was alone with her. In addition to all of that medical testimony, multiple doctors and nurses testified to the extensive injuries, including the bite marks, bruising, burns consistent with cigarettes, and a vaginal laceration. Again, these injuries could not have been self-inflicted. Dr. David Wold testified to a reasonable degree of medical certainty that the bite mark on T.J.'s shoulder and thigh were made by adult humans with enough force to break the skin, and he concluded that they were made by the same person and that the thigh mark required the assailant's face to be directly next to the child's genitals. And again, the Weister analysis could not exclude the defendant as a suspect, but it did exclude Devin, who the defendant is the only person they tried to point and blame this on. And additionally to all of that, the police recovery of physical evidence. They found all of the bloody evidence in the dumpster next door. The only possible person that could have done that is the defendant. This is not a case where the state's proof hinged on a single contested confession or the credibility of one impeached witness. The evidence was cumulative, consistent, and devastating. So accordingly, even if this Court finds that Devin's trial strategy was unreasonable, they still cannot prove prejudice. There was enough independent evidence to prove the defendant's guilt beyond reasonable doubt. For these reasons, the state respectfully requests this Court to affirm the judgment. Do you have any questions? No. Thank you, Ms. Hoffman. Thank you. Okay. Mr. Markfield? What do you have to say about the prejudice problem, Mr. Markfield? I would say, well, none of the evidence was conclusive. All the bits of evidence that opposing counsel ran through were flawed in some regard. There was a partial confession, but it was just partial. It was But it placed your client with the baby at the appropriate time. But that's near proximity, Your Honor. I don't think that it's fair to How about the buccal swap, though, the DNA? I'm sorry, Your Honor. The DNA? Yes. The DNA is not what you would normally hear in a case like this, where there's identification to an astronomical degree of certainty. They used a different DNA test leak involving application of the Y chromosome. And the defendant was nearly three times The defendant or a member of his family was nearly three times more likely than a random person to have left those marks. Moreover, they could have been left innocently because the defendant handled the baby. This is touched DNA. It's acknowledged by all that the defendant brought the baby downstairs to his mother, and that was when the injuries were discovered. So I don't think that the DNA or the partial confession, which was given after he complained that he had suffered a severe beating, and he was young and perhaps confused, I don't think either of those evidence, which are the strongest parts of the State's evidence, are sufficient to establish lack of prejudice, especially given the severity of what counsel did. I mean, counsel said, as noted, technical incompetence is his explanation. I mean, it wasn't a decision only between presenting the videos and not presenting the videos. It was a decision between presenting, not presenting the videos and presenting a redacted, presenting a redacted version of the videos. Why didn't counsel redact to eliminate all this prejudice? Well, he said he gave the answer, technical prejudice. And he said that not only to the judge who expressed, you know, dismay and concern about the risks of the strategy, but he said to the prosecutor, who very much to his credit also took into account the opposition's right to a fair trial. You know, this is not something that you see three-and-a-half hours of videotaped accusations and recollections of admissions and admissions who are pretty major. Unlike their testimony, unlike their testimony, Chelsea and Whitney's testimony, both of them in the videotapes said that they heard the defendant admit to sexual assault. How could it be reasonable for our strategy to elicit where the State did not, that your client admitted to sexual assault? And, of course, as I said in my main argument, there was also the consistencies that were magnified by the jury instruction that incorrectly informed the jury that it should give prior consistent rather than inconsistent statements unlimited consideration. So I think that we have both prongs of an effective assistance of counsel. I think in coming to recommend the action and to recall a shortigard that had the potential to highlight some of the  voices from the prosecution were undefinable otherwise, and certainly deficient performance and then because the evidence was far less than inclusive consequences. Mr. Markfield, just as an aside, the sentence was addressed in a post-trial motion. Are you familiar with this? The sentencing was addressed in a post-trial motion. Yes, sir. Anything after that? That issue wasn't appealed. I'm not suggesting it should have been. It's a very, very basic post-trial motion on excessive sentencing, and I didn't think that the length of the sentence was an appealable issue, Your Honor. Thank you. Thank you. Thank you, Mr. Markfield. Thank you for traveling to the Fifth District. Thank you, Ms. Osmond O'Brien, for your arguments here today. The matter will be taken under advisement. We'll issue an order in due course, and this Court is adjourned until 9 o'clock in the morning.